**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JENNIFER HODGES,** | : | **No. 1:12-CV-1848** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **MICHAEL J. ASTRUE,** | : | |
| **Commissioner of Social Security,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM  OPINION

## I.    Procedural History

In this case we are called upon to consider the sufficiency of an Administrative Law Judge opinion in a social security disability case which rejected the opinion of the Plaintiff's treating physician, the sole medical opinion on the record of these proceedings, that Ms. Hodges was totally disabled due to epilepsy.  Finding that the treatment of this medical evidence was inadequate we will remand.

On August 22, 2009, Jennifer Hodges ("Plaintiff") filed a Title II application for a period of disability and disability insurance benefits, alleging that she was disabled as the result of the frequent seizures that she suffers due to epilepsy.  (R.

at 12.)  Hodges also filed a Title XVI application for supplemental security income on September 15, 2009.  Id.  In both applications, Hodges alleged disability beginning June 1, 2008.  Id.  The Social Security Administration ("SSA") initially denied Hodges' claims on January 21, 2010.  Id.

Upon Hodges' request, a hearing was held before an Administrative Law Judge ("ALJ") on December 7, 2010, at which Hodges, her mother, and a vocational expert appeared and testified.  (R. at 28-55.)  On April 21, 2011, the ALJ issued a written decision denying Hodges' claims.  (R. at 12-21.)  On July 27, 2012, the Appeals Counsel denied Hodges' request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.  (R. at 1.)

On September 17, 2012, Hodges filed the Complaint and thus initiated this civil action.  (Compl. 1.)  This social security appeal is fully briefed by both parties and is, therefore, ripe for resolution.

## II.   **Statement of Facts**

Jennifer Hodges was 21 years old at the alleged onset of her disability.  (R. at 97.)  She completed high school and worked previously as a server.  (R. at 62, 98, 147, 151.)  She reported that she stopped working on June 1, 2008, as she was let go due to her seizures.  (R. at 146.)

Hodges has a history of epilepsy/seizure disorder.  (R. at 178-183.)  In 1999, Hodges was taking medications to control her epilepsy.  (R. at 178-79.)  Also in 1999, two EEGs were performed on Plaintiff, showing that she was potentially epileptic.  (R. at 180-83.)  An MRI of Hodges' head, performed in 2000, showed normal results, despite her hand tremors at that time.  (R. at 184.)

Twice in April of 2008, Hodges was admitted to the emergency room at Mercy Health Partners-Scranton due to her seizure disorder.  (R. at 186-201.) Emergency room notes indicated that no seizures were observed during these visits.  (R. at 195.)

In 2008 and 2009, Hodges received neurological treatment from healthcare professionals at Geisinger Specialty Clinic ("Geisinger").  (R. at 285-335.)  In November 2008, neurology records from Karen Tillotson, PA-C and Kelly A. Condefer, M.D., at Geisinger stated that Hodges likely had juvenile myoclonic epilepsy, which was poorly controlled.  (R. at 327.)  Dr. Condefer noted that Hodges' seizures increased in frequency over the prior month, with about one seizure weekly, and that she was not taking high dose folate.  Id.  Dr. Condefer and Ms. Tillotson planned to continue having Hodges take folic acid, and increased Plaintiff's Depakote to a therapeutic range.  (R. at 327-28, 330.)  Hodges reported weekly seizures, where she would fall to the floor.  (R. at 329.)  She also stated that she sometimes awakened disoriented, with blood on her shirt from having bitten

her tongue during a seizure.  Id.  Hodges reported having no problems with her epilepsy medications.  Id.

On December 12, 2008, Hodges was examined by Dr. Condefer for follow up, having reportedly had one seizure since her last visit on November 26, 2008. (R. at 321.)  Dr. Condefer suspected that Hodges was not taking her prescribed epilepsy medications as ordered, later noting Plaintiff's Depakote blood level was 30.  (R. at 310, 322.)  Dr. Condefer also prescribed Keppra to further control Hodges' seizures.  (R. at 322.)

On December 18, 2008, Mitchell J. Gross, M.D., of Geisinger, performed an EEG which showed minimal abnormalities due to rare dysrhythmic activity in Hodges' left posterior temporal region.  (R. at 316-17.)  The EEG showed no electrographic seizure activity, and no persistent focal slowing or epileptiform features.  (R. at 317.)

On March 24, 2009, Hodges visited Dr. Condefer for a follow up, and complained of almost daily myoclonic jerks in her hands, eyes, or sometimes her voice, or a combination.  (R. at 310.)  She reported a February 2009 emergency room visit due to a seizure, resulting in her dosage of Depakote being increased. (R. at 310.)  On May 1, 2009, during a follow up visit at Geisinger, Hodges reported five spells, and occasional twitching since her March 2009 visit.  (R. at 303-04.)  On May 16, 2009, June 24, 2009, and September 1, 2009, Hodges

presented to the Mid-Valley Hospital emergency room following seizures.  (R. at 221, 230, 238.)   Hodges' May and June 2009 CT head scans showed no abnormalities.  (R. at 229, 245.)  Her September 2009 CT scan showed vague hyperdensity of the deep left parietal lobe, of unknown etiology or significance. (R. at 220.)  A follow up MRI was recommended. (Id.)

During her next appointment on June 9, 2009, Hodges reported having experienced several falls since her last appointment, six grand mal seizures, and extremity jerks on a daily basis, causing her to drop things.  (R. at 297.)   The records note that Plaintiff was doing well with the addition of Lamictal.  (R. at 297.)

On September 27, 2009, at Hodges' follow up visit at Geisinger, she reported that she continued to have seizures every eight days.  (R. at 291.)  On October 27, 2009, during a visit with Adil A. Khan, M.D. of Geisinger, Hodges reported seizing every three to four days, with worsening epileptic symptoms since February 2009.  (R. at 285.)  She was diagnosed with uncontrolled generalized epilepsy, without mention of intractable epilepsy. (R. at 286.)

During a December 22, 2009 visit to Geisinger, Hodges reported less frequent seizures, only three or four, since her last appointment on October 27, 2009.  R. at 336.)   In 2010, Dr. Kahn diagnosed Hodges with generalized convulsive epilepsy, without mention of intractable epilepsy.  (R. at 629.)  A 24-

hour ambulatory EEG study administered by Dr. Kahn in January 2010 showed no seizure activity.  (R. at 404-05.)  In October 2010, Dr. Kahn interpreted Plaintiff's EEG results as normal.  (R. at 636).  He opined that further investigations and evaluations were needed for proper diagnosis and appropriate management.  (R. at 629.)  Neurological examinations conducted by Dr. Kahn showed normal results. (R. at 285, 629.)

In November 2010, Dr. Kahn completed a seizure residual functional capacity questionnaire ("SRFCQ").  (R. at 620-623.)  He diagnosed Hodges with generalized convulsive epilepsy refractory seizure disorder.  (R. at 620.)  He stated that on average, Hodges had three generalized seizures weekly, with daily myoclonic jerks.  (R. at 620).  He opined that Hodges was incapable of even low stress jobs, as stress could be a contributing factor to seizure activity.  (R. at 623.)

This medical finding of disability, rendered by Hodges' treating physician, is the sole medical opinion in the record of these proceedings.

## III.   Standard of Review

This Court's review of the Commissioner's decision denying social security benefits is a narrow one, and is limited to whether there is substantial evidence in the record to support the Commissioner's findings, and whether ALJ applied the correct legal standards.  42 U.S.C. § 405(g); Richardson v Perales, 402 U.S. 389,

401 (1971); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir 1988); see also Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008).   The substantial evidence standard is a deferential standard of review.   Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004); see also Johnson, 529 F.3d at 200 (citing Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000)).   The substantial evidence standard does not require a large or considerable amount of evidence; however, it does require "more than a mere scintilla," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401 (quoting Consol. Edison v. NLRB, 305 U.S. 197, 229 (1938)); Pierce v. Underwood, 487 U.S. 552, 564; see also Johnson, 529 F.3d at 200 (quoting Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999)).   Therefore, if a reasonable mind might accept the relevant evidence as adequate to support the Commissioner's conclusion, then the Commissioner's determination is supported by substantial evidence.   Jones, 364 F.3d at 503; Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986).

## IV.   Social Security Disability Benefits and the Five-Step Process

"In order to determine if an applicant is entitled to Social Security disability benefits, the ALJ applies a five-step sequential evaluation process." Cruz v. Comm'r of Soc. Sec., 244 F. App'x 475, 480 (3d Cir. 2007) (citing 20 C.F.R. § 404.1520(a)(4)(i)–(v)).   If a claimant fails to satisfy the requirements of steps one,

two, four or five then the ALJ will find that the claimant is not disabled.  Id.  "An affirmative answer at steps one, two or four leads to the next step.  An affirmative answer at steps three or five results in a finding of disability."  Id.

First, the ALJ considers the claimant's work activity, and if she is performing substantial gainful activity, the ALJ will find that she is not disabled. 20 C.F.R. § 404.1520(a)(4)(i).  Second, the ALJ considers the medical severity of the claimant's impairments, and if she does not have a severe medically determinable physical or mental impairment or a combination of impairments that has lasted or is expected to last twelve months or result in death, the ALJ will find that the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(ii); § 404.1509 (the duration requirement).   Third, the ALJ considers the medical severity of the claimant's impairments, and if she has an impairment that meets or equals one of the "Listings" and meets the duration requirement, the ALJ will find that the claimant is disabled.  20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the Listings).  Fourth, the ALJ considers the assessment of the claimant's residual functional capacity ("RFC") and her past relevant work, and if she can still do her past relevant work, the ALJ will find that she is not disabled.  20 C.F.R. § 404.1520(a)(4)(iv).  Fifth and finally, the ALJ considers the assessment of the claimant's RFC and her age, education, and work experience to see if she can make an adjustment to other work, and if she can make such an adjustment the ALJ will

find that she is not disabled.  However, if the claimant cannot make an adjustment to other work, the ALJ will find that she is disabled. 20 C.F.R. § 404.1520(a)(4)(v).

## V.    The ALJ's Decision

At step one, the ALJ found that Hodges did not engage in substantial gainful activity during the period from her alleged onset date until her date last insured. (R. at 14.)   At step two, the ALJ found that Hodges had the following severe impairments: epilepsy/seizure disorder.  Id.  At step three, the ALJ found that as of the date last insured, Hodges did not have an impairment or combination of impairments that met or medically equaled the severity of a Listing.  (R. at 15.)  At step four, the ALJ found that Hodges had no past relevant work experience.  (R. at 19.)  At step five, the ALJ found that Hodges had the residual functional capacity to perform sedentary work but would be limited primarily to a seated position; could not handle items or weights overhead; could not work at unprotected heights; could not climb ropes, scaffolds, or ladders absent emergency; and could only occasionally climb ramps or stairs.  (R. at 15.)  The ALJ found that jobs existed in significant numbers in the national economy that Hodges could perform.  (R. at 19.)  The ALJ thus found that Plaintiff was not disabled.  (R. at 20.)

In reaching this conclusion the ALJ rejected the medical opinion of Hodges' treating physician, which was the only medical opinion evidence on the record in

these proceedings, opining that in the ALJ's view this treating physician opinion was inadequately supported by treatment records.

## VI.   Discussion

In this appeal, Hodges asserts that the ALJ erred by:  (1) finding that Hodges did not meet medical listing 11.02, and (2) failing to assign the appropriate weight to Hodges' treating physician's opinion.  While we agree that Hodges' condition did not meet a medical listing, we will remand for further consideration of the treating physician's opinion.

### a. The ALJ did not err by finding that Plaintiff did not meet medical listing 11.02.

In order to qualify for benefits at step three of the sequential evaluation process, a claimant must match or equal a listed impairment.  Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992).  "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  Id. (quoting Sullivan v. Zebley, 493 U.S.521, 529 (1990)).  "The determination of whether a claimant meets or equals a listing is a medical one." Donlin v. Colvin, No. 3:13-CV-01912, 2014 U.S. Dist. LEXIS 82560, *44 (M.D. Pa. June 18, 2014) (Conner, C.J.).  However, a dispositive administrative finding regarding the ultimate issue of disability is reserved to the Commissioner.  20

C.F.R. §§ 404.1527(d), 416.927(d).   The purpose of the Listing of Impairments is to describe those impairments that are "severe enough to prevent a person from doing any gainful activity," regardless of their age, education or work experience. 20 C.F.R. §§ 404.1525(a), 416.925(a).   As a result, the medical criteria that define listed impairments are set at a higher level than the statutory standard for disability. Zebley, 493 U.S. at 528-32.   The claimant bears the burden of proving that her impairment meets or equals a listing.   Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

In order for a claimant to meet medical listing 11.02 for convulsive epilepsy, she must present documented evidence with detailed descriptions of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment.   20 C.F.R. § 404 Subpt. P, App. 1.   Under listing 11.02, the impairment must persist despite the fact that the individual is following prescribed antiepileptic treatment.   Id. Adherence to prescribed antiepileptic therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy.   Id.   When seizures are occurring at the frequency stated in 11.02, evaluation of the severity of the impairment must include consideration of the serum drug levels.   Id.   When the reported blood drug levels are low, the information obtained from the treating source should include the physician's

statement as to why the levels are low and the results of any relevant diagnostic studies concerning the blood levels.  Id.

Although there was some evidence presented showing that Hodges' seizures occur at the frequency required by the 11.02 listing, other diagnostic examinations taken during the relevant period were not conclusive, and did not reveal sufficiently significant neurological findings about the frequency or severity of the Hodges' seizures to satisfy the stringent listing requirements.  Thus, in February, May, and June of 2009, the CT scans showed no abnormalities.  (R. 229, 245, 482.)

Additionally, there was other evidence in the record that undermined the Hodges' assertion that she met a listing.  Hodges' treating neurologists at Geisinger recommended that she undergo inpatient video monitoring and further evaluation by an epileptologist before they could draw firm conclusions about the severity of her epilepsy.  (R. 291, 298.)  There thus appears to have been some uncertainty about whether Hodges was afflicted only with generalized convulsive epilepsy, or with intractable epilepsy – a condition that seems not to have been mentioned in most of the records.

Furthermore,

> Under 11.02 and 11.03, the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed epileptic treatment. Adherence to prescribed antiepileptic therapy can ordinarily be determined from objective clinical findings

> in the report of the physician currently providing
> treatment for epilepsy.  Determination of blood levels of
> phenytoin sodium or other antiepileptic drugs may serve
> to indicate whether the prescribed medication is being
> taken.  When seizures are occurring at the frequency
> stated in 11.02 or 11.03, evaluation of the severity of the
> impairment must include consideration of the serum drug
> levels.

20 C.F.R. pt. 404, subpt. P, appendix 1, § 11.00(A).   In this case there was insufficient evidence to show that Hodges was compliant with her anticonvulsant medication treatment, and this further undermines her assertion that she satisfied her burden of proving that she met listing 11.02.  Hodges' treating neurologist, Dr. Condefer, suspected that Hodges had a history of noncompliance with taking her medication.  (R. 322.)   The only evidence in the record of Hodges' serum drug levels is Dr. Confeder's notes showing that Plaintiff's Depakote blood level was below therapeutic levels for epilepsy.  (R. at 310.)   It is true that in Dr. Kahn's SRFCQ he indicates that Plaintiff was compliant with taking medication (R. at 621), but this is not dispositive, and the SRFCQ is insufficient evidence regarding Hodges' serum drug levels, and is contradicted in the record by Dr. Condefer's suspicion of noncompliance and the Plaintiff's low Depakote levels.  Based on a consideration of the foregoing, we do not agree with Hodges that there was sufficient evidence in the record to support her contention that she meets medical listing 11.02, and we do not find that the ALJ erred in concluding that she did not

meet her burden of proving that her epileptic condition satisfied the requirements of listing 11.02.

### b. The ALJ erred by dismissing the opinion of the Plaintiff's treating physician, the sole medical opinion in this case.

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" Morales v. Apfel, 225 F.3d 310, 317-18 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 429). Although an ALJ may consider his own observations of the claimant and this Court cannot second-guess the ALJ's credibility judgments, they alone cannot control and override the medical opinion of a treating physician that is supported by the record. Id. Although the ALJ may afford a treating physician's opinion more or less weight depending upon its supporting explanations, the ALJ may not ultimately reject it without contradictory medical evidence in the record. Id.; see also Plummer, 186 F.3d at 429.

In this case Dr. Kahn, Hodges' treating physician, completed a SRFCQ reporting that Hodges suffered from generalized convulsive epilepsy resulting in three generalized tonic-clonic seizures per week and daily myoclonic jerks lasting three to four minutes which would likely disrupt coworkers, could cause Hodges to

injure herself, would cause Hodges to suffer from memory problems, and would require additional supervision at work.  (R. at 620-23.)  Dr. Kahn reported that Hodges' seizures would result in postictal manifestations including confusion, exhaustion, irritability, and agitation.  (R. at 621.)  He recommended that she not work at heights, work with power machines, operate a motor vehicle, or take the bus alone.  (R. at 622.)  Dr. Kahn opined that Hodges would be incapable of even low stress jobs because stress could contribute to her seizure activity and that Hodges may be absent more than four days per month depending on her seizure activity.  (R. at 623.)

Dr. Kahn's opinion was the sole medical opinion regarding disability in this case.  It was an opinion from a treating source, and as such was entitled to great weight.  Yet, this opinion was rejected by the ALJ.

At the administrative hearing, the ALJ inquired of the vocational expert whether any competitive employment would be available to a hypothetical individual who would have frequent interruptions in work pace and efficiency, unscheduled breaks due to seizures or jerking, and would be subject to partial to full day absenteeism due to seizures.  (R. at 52-53.)  The vocational expert replied that this hypothetical individual would not be able to perform any competitive employment.  (R. at 53.)  In his written decision, the ALJ's RFC assessment stated that Hodges could perform competitive employment if it was sedentary in nature

with certain limitations, thus he impliedly rejected the limitations assessed by Dr. Kahn.  (R. at 15.)

In his explanation for discounting Dr. Kahn's opinions, the ALJ reasoned that Dr. Kahn's opinions were "not linked to any specific abnormal clinical findings or observations or confirmatory test results." (R. at 17.)  The ALJ stated, "It seems that his questionnaire responses are based mostly upon the claimant's self-report and description of her seizure disorder." Id.  The ALJ further stated that other medical sources are still looking to confirm by testing the prevalence of the seizure disorder or the nature of the seizures and "have not opined limitations of the nature and extent opined by Dr. Kahn." Id.  However, the ALJ does not cite to any medical source that contradicts Dr. Kahn's opinion.  The record contains no assessment of claimant's physical limitations by any other doctor or by any state agency medical consultant.   Id.   Instead, the ALJ attempted to support his conclusion by pointing out that results of an EEG administered by Dr. Kahn's were normal; however, it is not the place of the ALJ to substitute his own assessment of testing performed by a treating physician for the opinion of the physician who administered the test.

The only support for the ALJ's rejection of Dr. Kahn's assessment is the fact that other medical sources have declined to offer an opinion as to Hodges' condition without further testing.  The ALJ failed to point to any actual medical

evidence contradicting Dr. Kahn's assessment, thus he has failed to cite

contradicting medical evidence sufficient to justify his rejection of the treating

physician's assessment of Hodges' limitations.  It is well settled that:

> "An ALJ may not reject a physician's findings unless he
> first weighs them against other relevant evidence and
> explains why certain evidence has been accepted and
> why other evidence has been rejected."  Mason v.
> Shalala, 994 F.2d 1058, 1067 (3d Cir.1993) (internal
> quotation marks, citations and indication of alteration
> omitted).  Where the findings are those of a treating
> physician, the Third Circuit has "long accepted" the
> proposition that those findings "must [be] give[n] greater
> weight ... than ... the findings of a physician who has
> examined the claimant only once or not at all."  Id.
> (citations omitted)  An ALJ may reject a treating
> physician's opinion on the basis of contradictory medical
> evidence, see Frankenfield v. Bowen, 861 F.2d 405, 408
> (3d Cir.1988), and may afford a medical opinion more or
> less weight depending upon the extent to which
> supporting explanations are provided, see Mason, 994
> F.2d at 1065 ("[f]orm reports in which a physician's
> obligation is only to check a box or fill in a blank are
> weak evidence at best"), and whether the reporting doctor
> is a specialist, see Id. at 1067.  An ALJ may not,
> however, reject medical determinations by substituting
> his own medical judgments.  See Frankenfield, 861 F.2d
> at 408.

Terwilliger v. Chater, 945 F.Supp. 836, 842-3 (E.D.Pa.1996).

Here we find that the ALJ's disregard of the treating physician's opinion, the

sole medical opinion in this case, did not adequately address the significant weight

that this opinion is entitled to receive.  That opinion did not cite other opinions or

evidence directly contradicting Dr. Kahn's opinion that Hodges was disabled because no such directly countervailing existed. Instead, the ALJ's consideration of this treating source medical opinion approached something which the law prohibits–the substitution of the ALJ's medical judgments for those of the treating physician.  This opinion was, therefore, not supported by objective medical evidence, and this case must be remanded for a more thorough treatment of the medical evidence.

## VII.  Conclusion

Upon consideration of the administrative record, the ALJ's decision, and the parties' briefs, we find that the ALJ's decision with respect to Plaintiff's residual functional capacity at step five is not supported by substantial evidence in the record.  Accordingly, the Plaintiff's appeal is GRANTED, the Commissioner's decision will be VACATED, and this action will be remanded to the Commissioner for further consideration of the Plaintiff's claims.  An appropriate order will follow.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

Dated:  July 31, 2014